AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>

LODGED
CLERK, U.S. DISTRICT COURT

8/4/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ co ___ DEPUTY

</td><td>

FILED
CLERK, U.S. DISTRICT COURT

August 4, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ IV ___ DEPUTY

</td></tr>
</table>

United States of America

v.

FLORIN DUDUIANU,
   aka "Gheorghe Macingo,"
   aka "Sandru Nicu,"
   aka "Jonathan Hirschi,"

        Defendant(s)

Case No.   8:23-mj-00394-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 2, 2023, in the county of Orange in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of Unauthorized Access Devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Rene Persaud, Special Agent*
*Complainant's signature*

Rene Persaud, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   August 4, 2023

*Patricia Donahue*
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA:  Elizabeth Douglas, x5728

## AFFIDAVIT

I, Rene Persaud, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against FLORIN DUDUIANU ("DUDUIANU") for a violation of 18 U.S.C. § 1029(a)(2) (Use of Unauthorized Access Devices).

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices currently in the custody of the Placentia Police Department, in Placentia, California, as described in Attachment A:

      a.    A purple iPhone seized from Aurica Maruta ("Maruta") on August 2, 2023 ("SUBJECT DEVICE 1");

      b.    A blue iPhone seized from Maruta on August 2, 2023 ("SUBJECT DEVICE 2"); and

      c.    A black Samsung, IMEI 356679320398630 seized from Maruta on August 2, 2023 ("SUBJECT DEVICE 3," and collectively with SUBJECT DEVICE 1 and 2, the "SUBJECT DEVICES").

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. __BACKGROUND OF AFFIANT__

5.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2018.  Prior to becoming a SA, I worked for the FBI's Special Surveillance Group for approximately four years.  Prior to joining the FBI, I was a Deputy Sheriff for the Hillsborough County (Florida) Sheriff's Office for approximately three years.

6.    I have participated in various aspects of criminal enterprise investigations, including but not limited to, conducting surveillance and arrests, issuing subpoenas, seizing and impounding drug evidence, social media analysis, and the analysis of telephone tolls and other data.  Additionally, I have interviewed and/or debriefed confidential informants and other witnesses who have had knowledge regarding the investigations in which I have been involved.  I have also authored, sworn out, and executed multiple search warrants for various entities, including but not limited to, internet service

providers, social media companies, GPS tracking units, and physical residences/businesses.

7.    I also have extensive experience investigating Romanian Organized Criminal Groups.  I have conducted investigations in the Los Angeles area related to ATM skimming activity and money laundering, and I have also traveled to Romania on multiple occasions to work with National Police forces in several cities in order to obtain information, coordinate investigations, and identify criminals who travel from Europe to the United States to defraud the American banking system.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    DUDUIANU is a leader within a transnational Romanian organized crime group known as the Duduianu Clan.  DUDUIANU is the subject of an arrest warrant in Romania for acts of violence and he is also listed on Romania's Most Wanted Fugitives list. DUDUIANU fled Europe, illegally entered the United States, and traveled to the Los Angeles area.  Since arriving in the Los Angeles area in 2021, DUDUIANU applied for legal immigration status and opened a bank account using fraudulent identity documents.

9.    Among other things, DUDUIANU's organized crime group is involved in a scheme to steal personal identifying information and Electronic Benefit Transfer ("EBT") card numbers belonging to victims, and then use the stolen information to steal the victims' California benefits.  Between August 2022 and January 2023, the California Department of Social Services

("DSS") has detected more than $38.9 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  Much of this fraud is from two specific programs known as CalFresh and CalWORKs, which help low-income households pay for housing, food, and other necessary expenses.  Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

10.  For example, between on or about January 1 and January 5, 2023, more than approximately $117,000 was fraudulently withdrawn from ATMs at a single financial institution branch located in Toluca Lake, California.  The unauthorized withdrawals conducted during these five days affected approximately 152 victim EBT cardholders.

11.  Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals from multiple accounts in quick succession at one ATM.

12.  On or about August 2, 2023, at approximately 6 a.m., the Placentia Police Department ("PPD") conducted physical surveillance at a Wells Fargo ATM located at 111 East Yorba Linda Boulevard, Placentia, California.  DUDUIANU and his wife arrived, in a vehicle rented using an alias of DUDUIANU, and proceeded to the drive-through ATM.  At the ATM, law enforcement observed DUDUIANU withdraw cash from the ATM in rapid succession using approximately 3 different cards.  DUDUIANU and his wife

4

were arrested and found to possess 4 cloned EBT cards, and
approximately $1,850 in cash. Law enforcement also seized the
SUBJECT DEVICES from DUDUIANU's wife, which were concealed
within her clothing.

### IV. STATEMENT OF PROBABLE CAUSE

13.   Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.   Regulatory Background of CalFresh and CalWORKs Programs**

14.   DSS is a government agency that administers several
benefit and assistance programs for residents of the state of
California.  One of the assistance programs administered by DSS
is called CalFresh (formerly known as food stamps), which helps
low-income households purchase food and household items to meet
their nutritional needs.  Another assistance program
administered by DSS is called CalWORKs, which helps low-income
families with children pay for housing, food, and other
necessary expenses.

15.   Residents of California that meet the criteria
established by the CalFresh or CalWORKs programs can apply
online for benefits at www.getcalfresh.org and
www.benefitscal.com.  Beneficiaries apply for benefits by
submitting their income and number of dependents to determine
their benefit eligibility.

16.   CalFresh and CalWORKs benefits are issued through
Electronic Benefit Transfer cards ("EBT cards").  EBT cards are

mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

17.  The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

18.  Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

19.  The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.   Background on ATM Skimming and Access Device Fraud**

20.  Based on my training and experience in investigating fraud schemes, I know the following about ATM skimming and Access Device Fraud:

a.   A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

b.   On a legitimate debit or credit card, the information coded on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information coded on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be coded with the EBT card information, but the card itself will still bear the information of the gift card or bear no information if it is a blank white plastic card.

c.   Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

      d.   The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals.  For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number.  Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

      e.   As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming.  Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

**C.**   **Duduianu Clan's History of Organized Crime**

21.  Based on information I learned from Romanian law enforcement and publicly available news articles, I know the following about the Duduianu Clan:

      a.   The Duduianu Clan is one of the most violent and influential organized crime groups in Romania.

     b.   The group was founded by the brothers Nicolae ("Nicolae") and Ion Duduianu ("Ion") in the late 1980s. Historically, the Duduianu Clan participated in numerous crimes traditionally associated with criminal groups in the Balkan region of Europe, including, but not limited to, trafficking and forced prostitution of women, narcotics trafficking, robbery, and extortion.

     c.   Both Nicolae and Ion died while serving prison sentences.  Ion passed away in 2018 while serving a 10-year sentence for establishing an organized crime group and human trafficking, and Nicolae passed away in 2020 while serving a sentence for attempted murder.  Nicolae's son (and DUDUIANU's cousin) Florin Mototolea took control of the Duduianu Clan for a time but was stabbed to death in 2020 following a violent dispute with a rival group.

     d.   Following Mototolea's death, DUDUIANU became one of the leaders of the Duduianu Clan.

    **D.   DUDUIANU's Extortion and Flight from Justice**

22.  Based on information I learned from Romanian law enforcement and publicly available news articles, I know the following about the Duduianu Clan:

     a.   Since DUDUIANU became a leader in the Duduianu Clan, the group has continued to engage in organized crime activities, including running extortion rackets in Romania.

     b.   In 2019, Stefan Dudianu ("Stefan") -- DUDUIANU's brother -- got into a fight at an event because a musician performed without the Duduianu Clan's permission.  Stefan and

DUDUIANU then threatened the musician, telling him they would cut his tongue out if he did not pay them 100,000 euros as a penalty. The musician filed a complaint with the police, resulting in an arrest warrant being issued for DUDUIANU based on blackmail and robbery charges. DUDUIANU fled Romania to avoid prosecution for this offense, and an INTERPOL Red Diffusion[1] was later issued in August 2020.

c.   Romanian law enforcement determined that DUDUIANU fled Romania to Miami, Florida (via the Bahamas) in July 2021, and to the greater Los Angeles area.

d.   DUDUIANU is currently listed on Romania's Most Wanted fugitives list.

23.   Romanian law enforcement's belief that DUDIANU fled Romanian to Los Angeles, via the Bahamas and Florida, is corroborated by other information.

a.   Based on my review of Western Union records, I know that DUDUIANU, using an alias, received wires in the Bahamas and South Florida in July and August 2021, as discussed below.

b.   Based on Facebook records, I know that someone accessed a Facebook account associated with DUDIANU from an IP address in the Bahamas and California in August 2021.

c.   According to immigration records, there is no record of DUDUIANU legally entering the United States via an

---

[1] An INTERPOL Red Diffusion is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action. It is based on an arrest warrant or court order issued by the judicial authorities in the requesting country.

official port of entry.  This corroborates information provided by Romanian law enforcement about DUDUIANU's illegal entry into the United States.

### E.   DUDUIANU Uses Fraudulent Identity "Gheorghe Macingo" on Immigration and Bank Account

24.  During my investigation into DUDUIANU, I have determined that he has used the false name "Gheorghe Macingo" on bank accounts and immigration documents.

25.  Romanian law enforcement provided me with an American telephone number they believed was associated with DUDUIANU: 786-539-7830 (the "-7830 Number").  Based on records I received from Instagram, WhatsApp, and Western Union, the -7830 Number is connected to an Instagram account, WhatsApp account, and Western Union wires all associated with DUDUIANU.

26.  On September 27, 2022, I conducted database checks to locate DUDUIANU's current residence in Southern California.  During these database checks, I searched for any addresses associated with the -7830 Number.  I learned that P.O. Box 296 at the UPS Store located at 3100 Big Dalton Avenue Suite 170, Baldwin Park, California was registered to the -7830 Number under the name "Gheorghe Macingo."

27.  I went to the Baldwin Park UPS Store and asked employees about the owner of P.O. Box 296.  UPS employees provided me a copy of the Romanian Identification Card that "Gheorghe Macingo" provided when he opened P.O. Box 296.  I reviewed the photo of "Gheorghe Macingo," and compared it to photographs of DUDUIANU from social media and photographs

provided by Romanian law enforcement.  Based on this comparison, I was able to positively identify the photo of "Gheorghe Macingo" as DUDUIANU.

28.  Following further investigation, I discovered that "Gheorghe Macingo" had a Washington State Driver's License. Based on my comparison of photographs of "Gehorghe Macingo" on that license and a photograph of DUDUIANU, I concluded that this license was issued to DUDUIANU under his "Gheorghe Macingo" alias.

29.  Based on my training and experience in investigating Romanian organized crime, it is common for members of a Romanian "clan," including the Duduianu Clan, to use aliases in order to evade the detection of law enforcement.

30.  Based on Western Union records, I know that "Gheorge Macingo" received two wires in Nassau, Bahamas on July 22, and July 31, 2021, and a third wire in Aventura, Florida on August 10, 2021.  Based on my training and experience, as well as knowledge of this investigation, I believe that DUDUIANU was the ultimate recipient of these wires using the name "Gheorge Macingo."  This corroborates information provided by Romanian law enforcement that DUDUIANU fled Europe and traveled to the Bahamas and South Florida in the summer of 2021.

31.  In addition to these wires, I discovered Bank of America accounts that were opened in the name of "Gheorghe Macingo."  Based on my training and experience, as well as knowledge of this investigation, I believe that DUDUIANU opened these accounts using this alias.  These bank accounts (one

personal and one business) received over $380,000 in deposits
between October 2021 and December 2022.  Of those deposits, over
$233,500 were cash deposits, over $36,700 were teller transfers,
and over $18,000 were peer-to-peer transfers.  Because DUDUIANU
has no known legitimate source of income, these funds are likely
the profits of fraud.

32.   Based on further investigation, I discovered an USCIS
application for legal immigration status in the name of
"Gheorghe Macingo."  This application used the same date of
birth and Romanian identity number that DUDUIANU used to open
the P.O. Box in Baldwin Park.  These are also the same
identifiers used by "Gheorghe Macingo" to receive the Western
Union wires in Florida and the Bahamas.

33.   Based on my training and experience, as well as my
knowledge of this investigation, I believe that DUDUIANU
submitted a fraudulent immigration application using the alias
"Gheorghe Macingo" to obtain legal status in the United States
and so that his Interpol Red Diffusion would not be discovered.

**F.   DUDUIANU Arrested After Using Fraudulent EBT Cards**

34.   On August 2, 2023, PPD was conducting physical
surveillance at various bank and ATM locations throughout Orange
County, including a Wells Fargo ATM located at 111 East Yorba
Linda Boulevard, Placentia, California (the "Wells Fargo ATM").
This surveillance was part of an operation by PPD into EBT
fraud, and the Wells Fargo ATM had been identified by PPD as an
ATM frequently used by those conducting EBT fraud.

35.   Based on my conversations with PPD officers and my review of their reports, I know the following:

a.   At approximately 6 a.m., PPD officers saw two unknown individuals -- later identified as DUDUIANU and his wife, Maruta -- arrive in a rental vehicle and approach the drive-through Wells Fargo ATM at approximately 6 a.m.  Law enforcement saw DUDUIANU in the driver's seat of the rental vehicle, with Maruta in the passenger seat.  Based on Hertz Rental records, I know that the car driven by DUDIANU was rented under the name "Sanra Nicu."

b.   After DUDUIANU drove up to the Wells Fargo ATM, officers saw that DUDUIANU appeared to conduct multiple ATM withdrawals in rapid succession.  These transactions appeared to be withdrawals because law enforcement saw DUDUIANU appear to insert several different cards to conduct withdrawals and put the retrieved currency into the vehicle.  Based upon my training and experience, individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time.

c.   Based on the date (early in the month when EBT funds are typically disbursed), time (early in the morning), ATM location, and successive ATM withdrawals apparently using different cards during a short time period, law enforcement conducted a traffic stop and detained DUDUIANU and Maruta in order to investigate further.

36.   After DUDUIANU was detained, he was interviewed by PPD officers with the assistance of a Romanian translator.  Based on my conversations with PPD officers, I know the following:

a.   When asked what he was doing at the Wells Fargo ATM, DUDUIANU claimed he was depositing money into his account and the woman with him (Maruta) was someone he picked up on the street.  DUDUIANU also claimed he entered the United States approximately five to seven days ago through the Mexican border.

b.   When he was told that cameras captured his activity at the ATM, DUDUIANU became agitated.

c.   DUDUIANU was then read his Miranda Rights. Following further questioning, he maintained that he was depositing money and just met the woman in his vehicle.  Based on records provided by Romanian law enforcement, I know that Maruta was not someone DUDUIANU just met but is DUDUIANU's wife.[2]

d.   When PPD officers asked DUDUIANU to identify himself, DUDUIANU provided the name "Sandru Nicu" and produced a false identification card from Romania bearing this name and birth date of February 22, 1985.

37.   PPD officers subsequently arrested DUDUIANU for grand theft, conspiracy, and possessing a counterfeit access device in violation of California Penal Code §§ 182(a)(1), 487(a), 484f(a).

---

[2] Maruta is the true name of DUDUIANU's wife.  I compared a booking photograph of Maruta from August 2, 2023, to a photograph of Maruta provided by Romanian law enforcement and confirmed the photographs were of the same person.

38.   Investigator Monica Hernandez of the Orange County District Attorney's Office provided me with booking photos from August 2, 2023, of DUDUIANU booked under the name "Sandra Nicu." After viewing the photo of "Sandra Nicu," I was able to confirm that this was a photograph of DUDUIANU, based on my knowledge of his true identity.

39.   Based on my training and experience, I know that individuals conducting access device fraud schemes will often conceal their true identities by obtaining fictitious identity documents to enter the country illegally while evading detection by law enforcement.  In this case, DUDUIANU has used at least two different identities since illegally entering the United States in 2021 to flee justice in Romania.

**G.   Officers Seize Four Cloned EBT Cards, $1,850 in Cash, ATM Receipts, and SUBJECT DEVICES 1-3 from Maruta**

40.   After Maruta was detained, she was also interviewed and granted consent to a search of her person.  Based on my conversations with officers who conducted this search, I know the following:

a.   During this search, four cards were discovered concealed in her underwear.  The cloned cards consisted of a variety of re-encoded gift cards.[3]  Based on my training and

---

[3] Law enforcement confirmed the gift cards found on Maruta's person were cloned EBT cards by reading the magnetic stripe. Officers determined that the cards belonged to individuals other than DUDUIANU and Maruta.  Moreover, the cloned cards also were affixed with stickers bearing victim PIN numbers that corresponded to each cloned card, which were needed in order to conduct the unauthorized ATM withdrawals.

experience, individuals who hide items in in their underwear are often seeking to conceal those items from law enforcement.

      b.  Maruta also had approximately $1,850 in cash concealed in her underwear.  Subsequent investigation revealed that this amount matched the total amount withdrawn from the Wells Fargo ATM in the three fraudulent transactions DUDUIANU had made.  Three ATM receipts were also found on Maruta's person for transactions that occurred between 6:00 a.m. and 6:03 a.m. on August 2, 2023.

      c.  In addition to the cards, cash, and ATM receipts, SUBJECT DEVICES 1, 2, and 3 were found concealed on Maruta's person.

     41.  In my training and experience, it is common for the female partners of members of Romanian organized crime groups to conceal evidence for their male partners.  There is even more incentive to do so with someone like DUDUIANU who is wanted in a foreign country and believed by law enforcement to be the leader of an organized crime group involved in extensive fraud.

     42.  Officers subsequently interviewed two of the cloned EBT card owners, R.S. and J.B.  Both confirmed that neither DUDUIANU nor Maruta had permission to possess or use their EBT cards.

     **H.**   **OTHER FRAUDULENT ACTIVITY RELATED TO DUDUIANU**

     43.  In addition to the fraudulent activity DUDUIANU engaged in on August 2, 2023, described above, DUDUIANU is suspected of engaging in fraudulent activity throughout the United States.  Based on conversations I have had with other law

enforcement officers, review of law enforcement reports, and my own knowledge of this investigation, I am aware of the following:

        a.   In April 2023, someone using the alias "Jonathan Hirschi" rented a car at the Dallas Fort Worth International Airport in April 2023.  Subsequently, "Jonathan Hirschi" left the state of Texas with the vehicle, and never returned the vehicle after the rental contract expired.  As a result, officers from the Texas Department of Public Safety filed felony charges for theft greater than $30,000 and under $150,000, a third degree felony in the state of Texas, and tampering with a governmental contract, a second degree felony in the state of Texas.  I have reviewed the photograph on the identity card provided by "Jonathan Hirschi" and confirmed that it matches the photograph of DUDUIANU.

        b.   Furthermore, the FBI received a complaint from the Mobile County Sheriff's Department in Mobile, Alabama, regarding another fraud incident involving "Jonathan Hirschi." In June 2023, "Krause Auto Sales" posted a 1978 Ford Bronco was posted for sale on the internet.  Victim D.L. wired $31,000 to "Kruse Auto Sales," but never received the vehicle.  The Mobile County Sherriff's Department discovered that "Jonathan Hirschi" was the authorized signer on the account for "Kruse Auto Sales." I have reviewed the photograph on the identity card provided by "Jonathan Hirschi" provided for this account and confirmed that it matches the photograph of DUDUIANU.

44.  Thus, to date, DUDUIANU has used at least three separate false alias while in the United States.  He has used these aliases to commit multiple crimes, as described above.

**V.  TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES**

45.  Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.  It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.  Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items

retrieved from stolen mail or mail matter, with their
cellphones.

c.    It is also common for identity thieves to keep
"profiles" of victims on digital devices.  Such "profiles"
contain the personal identifying information of victims, such as
names, Social Security numbers, dates of birth, driver's license
or state identification numbers, alien registration numbers,
passport numbers, and employer or taxpayer identification
numbers.  Identity thieves often keep such information in their
cars, storage units, and in their digital devices.

d.    It is common for identity thieves, and
individuals engaged in bank fraud, access device fraud, and
identification document fraud to use equipment and software to
print credit and identification cards, to create magnetic strips
for credit cards, to use embossing machines to create credit
cards, to use laser printers to create checks, and to use
magnetic card readers to read and re-encode credit cards.  These
types of devices are routinely kept where the person will have
easy access to such devices, such as on their person or in their
cars or homes or storage units.  Software relevant to such
schemes can also often be found on digital devices, such as
computers.

e.    Based on my training and experience, I know that
individuals who participate in identity theft, bank fraud, and
access device fraud schemes often have co-conspirators, and
often maintain telephone numbers, email addresses, and other
contact information and communications involving their co-

conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

       f.   Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[4]

46.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

       a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

---

[4] As used herein, the term "digital device" includes the SUBJECT DEVICES as well as any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain

22

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

47.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

48.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

23

which I know from my training, experience, and review of
publicly available materials:

      a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress DUDUIANU's and Maruta's thumbs and/or
fingers on the device(s); and (2) hold the device(s) in front of

DUDUIANU's and Maruta's face with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

49.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

50.  For all of the reasons described above, there is probable cause to believe that DUDUIANU has committed a violation of 18 U.S.C. § 1029 (a)(2) (Use of Unauthorized Access Devices).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 4th day of
August 2023.


_Patricia Donahue_
_____
THE HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE